Good morning, Your Honor. I'm Barbara Strickland. I represent Petitioner Jesus Pena-Morales, who is present here in court today with his family. The Supreme Court said in Fong-Han The BIA's decision in this case flies in the face of the due process that's required for such a drastic measure to be imposed. I'm going to be looking at due process from a couple of different perspectives. And the first perspective I'd like to look at is the evidence that was presented and that was not presented. Both the immigration judge and the BIA totally disregard Hernandez-Guadarrama 394-F3-674. For example, the BIA illogically concludes that Mr. Pena was not denied of an opportunity to cross-examine witnesses who were not called by the government, that is, Officer Baca, the driver of the vehicle, or the child who was the alleged smugglee. Counsel, so I understand your argument. You're saying that the opportunity to cross-examine was denied because the government neglected to call these witnesses? Hernandez-Guadarrama v. Ashcroft. Could you answer my question first? Is that your argument? Is it your argument that your client was denied the opportunity to cross-examine these witnesses because the government failed to call these witnesses? The government introduced evidence that came from those persons. And Hernandez-Guadarrama says that the government doesn't have a wholly unfettered choice to produce witnesses or to rely on sworn affidavits or declarations. These witnesses could have been crucial, could have been critical in this case. There's an even more serious violation of due process with the introduction of the alleged transcript of this missing videotape. And it's curious that two of the related cases that have already been submitted by this panel, Gonzalez-Valela v. Lynch and Rodriguez-Echevarria v. Lynch, also involved a missing videotape. Mr. Crickland, may I ask, when you refer to the transcript, I don't see anywhere in the record that you have contested the validity of the transcript report itself. In other words, you're not saying that the transcript did not truly reflect what the video said. Yes, I believe we did contest that. First of all, Mr. Pena said that the transcript had things that he never said. Have you identified with specificity those things? Your Honor, I think it's not reasonable to expect us four years or five years after the fact to say, here it says this, but that wasn't what he originally said when we don't have access to the original evidence. If we have access to the original video and the transcript, then we can go through and identify point by point where the problems may have been. But I think it's important to point out that even the transcript has Mr. Pena saying, I don't understand what's going on here, which is something that the government simply has not addressed. It also hasn't explained how it is out of three out of four cases they happen to have a missing videotape. The testimony regarding how Mr. Pena and his family were treated is similar to the allegations in matter of Garcia, 17 INN decision 319. And the same facts were held there to be sufficient to present a prima facie case of duress. The BIA wrongly concludes that Mr. Pena's statements were not under duress because he allegedly stated in the missing videotape that he was treated fine. As I have argued, reliance on this transcript is a violation of due process. And in both Gonzalez Varela and Rodriguez Echevarria, which this course has already taken under submission, we find a non-citizen allegedly saying on the transcript of the missing videotape that he or she was treated fine and statements were made voluntarily. Yes. If we disagree with you regarding the decision to admit the transcript of the videotape, do you lose? I don't want to make an opinion. I don't think so, Your Honor. I think that there's enough prejudice in the fact that the makers, Officer Baca wasn't there, that alleged smuggler wasn't there in this case and that the government's duty to produce that evidence and they didn't do it here. May I ask, you are relying on the case Hernandez-Guadarrama v. Ashcroft? That's correct. And would you agree that in that case the government had deported the witnesses and therefore they were unavailable to testify? That's correct. And the child in this case was apparently also deported or turned over to the Mexican government since he was a minor. The other witnesses were not deported, right? The other witnesses you're referring to were not deported. Officer Baca was not deported and we don't know why the government didn't make him available. Mr. Martinez was not deported because he was a United States citizen and promptly disappeared after this incident. So my question is, does the rationale of Hernandez-Guadarrama v. Ashcroft apply when there is no deportation of the prospective witness involved? Well, one of the witnesses was deported, the child involved. And the child could have exonerated Mr. Pena. All right. But what about the other two individuals? Does Hernandez-Guadarrama apply to those two individuals? Yes, Your Honor, because they're relying on a report by an officer. And we objected to that from the very beginning. What case that does not involve deportation of witnesses supports your argument as to the immigration officers? The government has a responsibility to call these witnesses. That dent can be used to support the same argument. The government doesn't give Mr. Pena a fair opportunity to fight his case. Well, dent stands for the proposition that an immigrant is entitled to access to the documents in the A file. It doesn't address witnesses. Well, Your Honor, I disagree that Aguilar-Gonzalez v. Mukasey is another question that says the government can't just throw out this stuff and expect the alien involved to contest it. And I see I'm running out of time. And I want to move just a moment to the adverse credibility determination. I want to point out the only place that Mr. Pena says that he was treated fine was in this transcript of a missing videotape. The videotape could have exonerated him, Mr. Martinez could have exonerated him, and the child could have exonerated him. It is simply unconscionable to deport a person who has had legal permanent residence in this country and the whole family in this country on this type of evidence. Thank you. I'm going to start with Hernandez-Guadarrama. That case is distinguishable not just because of the deportation of the witness, but the only evidence in Hernandez in the I-213 was from the smuggler who had been deported. The I-213 contained evidence from the smuggler and from Hernandez's wife. The government agreed not to rely on the statement from the government's wife. So the only evidence left was that from the smuggler. Hernandez never made a statement in that case admitting to participating in smuggling. Counsel, could you address the missing videotape? Your Honor, yes. The government first looked for the videotape in, let me see, in, I believe, they issued a report that they could not locate the videotape. What period of time had elapsed from the time the videotape was made until the time that the government endeavored to look for it? It was about two years. Okay. What's the practice of the government in terms of safekeeping those types of tapes? Well, I believe one of the witnesses indicated that they're not sent away for transcription until, or unless and until they're requested by counsel. In this case, the timeline's not exactly clear. The practice, I'm not exactly sure, but I can say that the video was transcribed on November 4, 2009, which was just about one week after the government officials first said they couldn't locate it. So it's very likely that the video had been sent away for transcription, and that's why it was not able to be located at the facility. Once it was sent away for transcription, the government didn't track it? Or did it somehow disappear between the time it was sent for transcription and the time the government thought to look for it? Well, the government again looked for it, I believe, in 2011, and at that point it was unable to be found. It's not entirely clear why or what happened. I believe Officer Reyes, one of the witnesses, testified that they also couldn't find the logbook indicating the record-keeping, the history of where it had been located. Is that common? I don't know how common that is, Your Honor. I know, as opposing counsel mentioned, that that was the case. The video was missing in a few other cases. Here, we don't think there's any prejudice to that, because we do have a transcript, both in the Spanish language and translated, of what was on the videotape. Counsel, may I ask when the transcript was prepared? It was prepared on November 4, 2009, which was just about eight days after the initial public hearing. There was no DHS notification that they had been unable to locate it. And then we really don't know what happened to the videotape after it was transcribed. There's nothing in the record about that. I find that hard to understand. The videotape was mislaid, but nevertheless a transcript was made? I don't understand that. Your Honor, what probably happened, I think this is what the board mentioned in its decision, was it wasn't mislaid, it had been sent away for transcription. And so when they looked for it at the facility, it wasn't there, because presumably it had been sent away. And no one was aware of that? Apparently not, Your Honors. There's no indication in the record specifically what happened to the videotape. But when it was sent away for transcription, what was the delay between the time it was sent away for transcription and when the transcript was produced? Well, we don't know exactly when it was sent away, Your Honor. We know that on October 27, DHS submitted a letter saying they could not find the videotape. And we know that on November 4 is the date the transcript was made. But we don't know how much before October 27 the transcript had been sent to the transcription service. I don't know what the turnaround time is for transcribing the videotape, but it would have had to have been watched, transcribed in the Spanish language, and then transcribed after translation into English. Well, aren't you puzzled like I am that a transcript could be made when the videotape can't be found? Well, as the Board indicated, it's likely that the videotape obviously could have been found. Whoever wrote the report on October 27 apparently was unaware that it had been sent away for transcription. So they could not find it on site is I think what the document indicates, the October 27 document, but it had been presumably sent away for transcription. When did the government become aware that a transcription had been done? That I'm not sure of, Your Honor. I don't have the exact date those documents were submitted. I believe it was in 2010 the government submitted the transcript and the incident reports from Officers Anderson and Backus and the I-213, but I don't know precisely when. It's important to note here is that the transcript is in some ways a secondary issue. It provides extra evidence indicating Mr. Pena's involvement with the smuggling. But you can understand the angst of someone who gets a transcript as opposed to a videotape if the videotape is more accurate in their view of what actually transpired. Yes, Your Honor. Yes, I do, Your Honor. But the problem here is that Mr. Pena, his other arguments are based on the fact that he made these statements, that he helped smuggle in this alien. And so he doesn't deny the material evidence that the videotape would have provided, which is that he confessed that he helped smuggle in this alien. Well, what about the evidence of coercion? Wouldn't the videotape be more pertinent in terms of being able to observe the actual interactions of the parties? It may, Your Honor, but there's a couple of key points. One, what was said in the videotape sworn statement was duplicative of what, in large part, of what he had said at secondary inspection, which started at 1.50 in the morning, like some eight hours before the videotape sworn statement was made. At that, in secondary inspection, he said initially that all of the children were United States citizens. And then when the immigration officer, after speaking with the child and learning that he was not the child of Mr. Pena or his now wife, and that he was a Mexican citizen, when the immigration officer told that to Mr. Pena, Mr. Pena conceded, and this is on page 450 of the record, Mr. Pena conceded that he had gone to Mexico to pick up the boy doing a favor for a friend in Reno, and that he used the birth certificate from his wife's son in order to do so. So the transcript of the sworn statement merely repeated, he repeated those same statements and provided more detail, but the coercion claims are inapplicable to the statements made at secondary inspection, because there was no weight of time before the interview, there was no lack of food or water. This was in the vehicle not long after they had gotten to the border. It's also worth noting that the transcript contains Mr. Pena saying that the father of the boy was a Mr. Carmona, which the government would have had no way to know that the name of the father of this child was Mr. Carmona. So the attempt to suggest that all of the transcription was manufactured by the immigration officers makes no sense, given that the name of the alien smuggler was included in the transcript. Ultimately, whether the document should be admitted comes down to whether it was probative and fundamentally fair. And in this case, Your Honors, we believe that the evidence establishing Mr. Pena's removability for assisting in alien smuggling was probative and it was fundamentally fair, and in this case, Mr. Pena also had the opportunity to cross-examine the officer who spoke with him at secondary inspection, as well as the officer who conducted the sworn statement by videotape. Thank you, Your Honors. Thank you, Your Honor. There is pure speculation by the Board of Immigration Appeals that this transcript may have been out to be, or the videotape may have been out to transcribe. We don't know. The logbook is mixing. We have, other than the transcript, we have no evidence whatsoever that the video was ever made. And I want to focus on the government sent me a letter on October 27, saying that they had made a diligent search for the videotape. It wouldn't occur to them that maybe they had sent it to be transcribed. That's total speculation. And as the Court knows, the Court, they simply cannot speculate. Mr. Pena denies that he made any statements whatsoever to Officer Anderson at the garage area of secondary. He spoke to a different officer whose name was Monica. Officer Reyes says, Monica told me this. Monica was never identified. Mr. Pena was not the person. He said there's no contradiction in who gave the documents. The IJ said that there was, and it just doesn't exist. Mr. Pena's wife consistently testified that she had all of the documents with her in her purse, and when she took them out of her purse, the officer grabbed them. And one of the officers actually used this word, grabbed, we grab them. So I don't think that's prejudicial. There's just so much here that, and it's seen so often in other cases, that there is a due process violation. A number of these issues could have exonerated Mr. Pena. All right, Counsel, thank you. You've exceeded your time. Thank you to both Counsel.
judges: O'scannlain, Fernandez, Rawlinson